**Mary A. JOHNSON, Appellant (Defendant Below),**

v.

**James N. JOHNSON, Appellee (Plaintiff Below).**

**No. 3–379A89.**

Court of Appeals of Indiana, Fourth District.

July 15, 1980.

Rehearing Denied Aug. 21, 1980.

Otto M. Bonahoom, Bonahoom, Chapman & McNellis, Fort Wayne, for appellant.

James E. Springer, Fort Wayne, for appellee.

YOUNG, Judge.

Mary Johnson appeals a decree of dissolution of her marriage to James L. Johnson contending that the trial judge erred in three respects: first, that the cross-examination of a witness was so restricted as to prevent impeachment; second, that the trial judge demonstrated by his conduct actual prejudice against her requiring that he disqualify himself from acting in the case; third, that the trial judge's decision to place custody of their minor child with James L. Johnson was not supported by sufficient evidence. We reverse. Because of our resolution of the issue of custody, the other issues relating to custody will not be discussed as they are unlikely to surface on retrial.

The standard for review of a trial court's findings in a custody determination upon the dissolution of marriage is limited to the question of abuse of judicial discretion. The standard to be considered by the court is the "best interests of the children." As said by the court in *Schwartz v. Schwartz*, (1976) Ind.App., 351 N.E.2d 900, 901:

'It is within the discretion of the trial court to award custody of the children consistent with their best interest, and this court will not reverse the award un-

less a manifest abuse of discretion is shown. . . .'

'The welfare of the child is paramount to the claims of either parent, and its care and custody should be awarded with regard to the best interests of the child. The trial judge is in a position to see the parties, to observe their conduct and demeanor, and to hear them testify, and his decision ought not be reversed unless an abuse of discretion has been shown. . .'

'The disposition of children is not controlled by hard and fast rules of law but by the exercise of sound judicial discretion of the court confronted with the problem. Review by an appellate court of such disposition is limited to the question of abuse of judicial discretion.'

An abuse of discretion is defined by the court in *Shaw v. Shaw*, (1973) 159 Ind.App. 33, 304 N.E.2d 536, 539 as

An abuse of discretion is an erroneous conclusion in judgment, *one clearly against the logic and effect of the facts and circumstances before the court*, or the reasonable, probable, and actual deductions to be drawn therefrom.

█ The trial judge made no findings regarding why awarding custody of the nine month old daughter to the father was in the best interest of such child. Nor were any requested. Any rationale for such decision must be gleaned from his extemporaneous remarks at the conclusion of the evidence.

THE COURT: Well, I must confess to you, gentlemen, that I don't understand this case—at all. I don't know what to believe. There's so much in it that makes absolutely no sense from any standard of human experience that I don't even begin to know where to get a handle on it. I don't, I don't know what to believe. I have the feeling that there's something here that all of you are conspiring not to tell me, that would help me understand it. It would be very easy to believe that, that this marriage is simply a sad story of a widower with a couple of children, who married a younger woman who wasn't mature enough and ready for marriage. Be very easy to believe that. Certainly a lot of things have happened that would support that kind of an, an analysis of this case. It's inconceivable to me that this woman could have moved out on her husband after two months without having made any tangible, noticeable, recordable or otherwise rememberable effort to resolve her problems. And, it's inconceivable to me that her mother could help her. But that seems like too simple an answer, because there are, in spite of all of Mr. Springer's witnesses that indicate that his client is a fair to middlin' person who's doin' a good job of comping (sic) with a nasty break that fate dealt him, he's a good father, there are some indications that there may be more below the surface than that, and I really don't know whether he's a boozer or he isn't, because there isn't anybody to confirm that. The only person I'm hearing that from is Mary, or anybody she told. I realize that's kind of a hard thing to kind of prove, under this, in this kind of an environment. I know that. You know, but when I look at all the indications of the, when look at everything that would indicate that maybe that's a fact, I've got to weigh it all kind of carefully because there are motivations behind everyone who said that saying it. There's certainly no reason for me to believe, other than maybe some indication of maturity and indecision, that Mary isn't a perfectly capable person to care for her own child. She does have some problem areas because capability is not the only thing I look at. When I look at some of the other things, I've got to be candid, I don't like what I see. Got a son, yet his paternity's never been established. He's never been allowed, or permitted, or encouraged to have a relationship with his father, and worst of all, his right to his economic, to the economic support of his father was apparently thrown away by his mother, or by others, and I don't think she's handled that well. She's now got another child. Twenty-three years old. Two children, one short-term unsuccessful marriage. If she is, in fact, "hung up" on the business of her religion, it ap-

pears to me that she presents a not very movable commodity in the marriage market, and that her prospects of having a complete family unit for these two children she has in the future are dim. And that's certainly something I've got to look at in deciding where this child should live. The father of this child has a functioning, operating household with siblings of the same sex. I've got to look at that, too. But maybe he's also a Jekyll and Hyde as you're suggesting, and maybe there are problems with him. Certainly some indications of that. Question is, how do I, how do I amass enough evidence to make myself decide whether that's so or it isn't so? You know, I can't resolve the problem of custody by the simple expedient of saying a child ought to be raised by her mother, because that's a fairy tale. Most of the time that's true, but it sure isn't true all of the time. And I'm really in a quandry. Very difficult for me to know where to go. I don't even understand what happened to this marriage, completely. You know, and I say to myself, well, maybe what she's, maybe what she's saying was the way it really was, and then I remember the suggestion contained in the file that her mother refers to the father of Jeffrey as "that bastard", and I wonder whether everybody's a bastard, whether they are or they aren't. Now, maybe, Jeffrey's father was a bastard, I don't know. I don't know anything about that. Apparently, he and Mary didn't get married for some reason, presumably to do with religious differences. Maybe all of that had an influence on why that child's got a, no father and no support. And it would be easy to speculate that maybe Jennifer's gonna wind up the same way if I allow her to stay with her mother, except for one thing, and that is that Mr. Johnson's certainly aggressive enough to make sure that doesn't happen. I even toyed with the possibility of trying to resolve this by finding that there's not an irreconcilable breakdown of the marriage relationship, and ordering them to ninety days mandatory counseling, as the statute allows me to do, since Mary never made any real effort to resolve her marital differences. And

maybe it wouldn't be too late for her to try that, except that I suspect that that's not realistic either, because I don't suppose that much can get resolved in ninety days, and unfortunately, Jim has piled some more things on her original grievances since then. And I suspect that they probably have no common ground left to resume living together as husband and wife. Well, I'm just trying to explain to you why it isn't going to be easy for me. I do think, however, Mary, that you've got to get your act together. Regardless of how this turns out, you've got to get your act together, and you need some professional help to do that, and that doesn't come from a priest, unless he's got a Ph.D. or a Master's Degree is psychology, and some experience at counseling. And, if he doesn't, then go elsewhere and seek the help of some professionals, because something's wrong, something's terribly wrong, and you've got to get your act together if you're gonna have any kind of a happy life ahead of you, and if you're ever gonna be able to provide a normal family unit for these kids, and they deserve that. They deserve it. They're the victims. They're the real victims of all of this, and they're entitled not to have to grow up in a single parent family. So I hope you give that some thought. Preferably, you'll give it some action, 'cause we got all kinds of individuals and all kinds of agencies which exist for the sole purpose of doing that kind of work. Well, I'll let it sit on my desk and marinate until it falls into place, and then I'll write the decree. Hopefully, that won't be very long, although the pile on my desk is getting bigger all of the time.

MR. BONAHOOM: Your Honor, would it, I recognize, I can understand that problem. I, I don't know whether it would be of any assistance to you, but I, I'm sure that Mr. Springer and I, either one, would be happy to at least give you our—not now, it's five o'clock. I'm not suggesting we do it now, but if you, if you are going to take it under advisement as you've indicated, if you think it would help to, to have us present our arguments and reasoning, we, I'm sure that he'd be happy to do it and I will, too.

THE COURT: Oh, I think your clients have very articulately stated their own cases. Mr. Johnson seems to have fewer reasons, perhaps, but, but I understand what he's saying, and I understand what Mary's saying. Hers is a more basic appeal, I guess. Nobody's equipped to care for a baby child—for a baby female child—like the mother. Mr. Johnson makes the point that it isn't going to be the mother who is providing the substantial portion of the care, but then a lot of children have survived that. One thing that's extremely interesting is the amount of partisan ferocity that seems to have been generated by these people's short-time marriage. I find that interesting. I don't know what I would do if I had been a friend of Jim and Mary's before they got married. I suspect I'd feel sorry for both of them. Thank you, gentlemen.

MR. BONAHOOM: Thank you, Your Honor.

MR. SPRINGER: Thank you, Your Honor.

(AND THIS CONCLUDED ALL OF THE PROCEEDINGS HAD AT THE TRIAL IN THE ABOVE CAUSE.)

These comments may reflect the trial judge's thoughts and impressions but can hardly be characterized as findings of fact, formal or informal. They appear to be gratuitously made. But they do indicate the trial judge's quandry at the absence of evidence upon which he could make a decision regarding what the best interests of the child would be.

We are not directed to any evidence that favors either parent on the issue of custody of the child or any evidence which reflects upon the capacity of either parent to serve the child's best interest which was considered by the trial judge. Nothing demonstrates that the factors in IC 31–1–11.5–21(a) were utilized by the trial court in determining what custody arrangement was in the best interests of the child. *See Franklin v. Franklin*, (1976) Ind.App., 349 N.E.2d 210, 212.

Therefore, the trial court's decision is unsupported by the evidence and contrary to law.

Reversed and a new trial ordered upon the issues of custody and support.

MILLER, P. J., and CHIPMAN, J., concur.